[No. 25031-8-III.   Division Three.   November 15, 2007.]

EMMA JEAN HOUSEL ET AL., *Appellants*, v. CHARLES W. JAMES, *Respondent*.

751

*Michael E. de Grasse*, for appellants.

*Christopher J. Mertens* (of *Miller, Mertens, Spanne & Comfort*), and *Mary H. Spillane* (of *William Kastner & Gibbs*), for respondent.

¶1 SCHULTHEIS, J. — Emma Jean Housel appeals a jury verdict in favor of Dr. Charles James in a medical malpractice action. The case arose out of a laparoscopic hernia repair performed by Dr. James that resulted in a perforation of Ms. Housel's small bowel. Believing an abscess that developed months after the surgery was caused by the perforation, Ms. Housel sued Dr. James, alleging negligence and breach of informed consent. A jury rejected both claims. On appeal, Ms. Housel contends the trial court erred in refusing to allow her to base an informed consent claim on Dr. James's failure to disclose his alleged lack of operative experience. She also alleges instructional error. Finding no error, we affirm.

### FACTS

¶2 On July 19, 2001, Ms. Housel, then 78 years of age, underwent surgery to repair a paraesophageal hernia.[1] Dr. James, a general surgeon, who had performed only one such surgery, was Ms. Housel's surgeon. During the surgery, Dr. James perforated a portion of Ms. Housel's intestine. He immediately repaired the perforation. Three days after Ms. Housel's release from the hospital, her surgical incision began to leak. Dr. James discovered that his repair of the intestinal tear had broken down. He repaired the tear. When Dr. James saw Ms. Housel on August 3, she was feeling better and her incision was healing.

¶3 However, on August 27, Ms. Housel was complaining of lower left quadrant pain. Dr. James ordered a CT (computed tomography) scan to rule out an abscess. The

---

[1] Dr. Philip Jensen, a gastroenterologist, explained that a paraesophageal hernia is a type of hiatal hernia in which part of the stomach moves above the diaphragm and lodges beside the esophagus.

scan revealed diverticulitis, but no abscess. On September 5, Ms. Housel reported that her pain had resolved but that she still had mild, low grade fevers. When Dr. James last saw Ms. Housel on September 19, her incisions had healed, and she had no reports of pain. After intermittent abdominal pain during 2002, Ms. Housel contacted Dr. Jeffrey Harris, an internal medicine physician. A CT scan revealed an abscess near Ms. Housel's spine.

¶4 On July 15, 2004, Ms. Housel sued Dr. James for medical negligence and breach of informed consent. She alleged that Dr. James should have informed her of his inexperience because it increased the risk of surgical complications and led to premature surgery. Dr. James's subsequent motion for summary judgment was denied, and the case proceeded to trial. At trial, Ms. Housel sought to use Dr. James's alleged inexperience to establish informed consent and medical negligence claims. The trial court allowed evidence of Dr. James's experience to support the medical negligence claim but excluded it on the issue of informed consent.

¶5 Ms. Housel's expert witness, Dr. Robert West, a retired surgeon, opined that the surgery was premature. He believed that Dr. James should have ordered other tests before operating on Ms. Housel, and that watchful waiting was a viable alternative to surgery. Dr. West conceded that paraesophageal hernias are rare and that Dr. James had not breached the standard of care in his performance of the operation.

¶6 Dr. Steven Beyersdorf, a surgeon, emphatically disagreed with Dr. West, testifying that paraesophageal hernias are always treated surgically. He explained that paraesophageal hernias are semiurgent and can lead to death if untreated. Dr. Beyersdorf rejected watchful waiting as a viable alternative to surgery, stating, "Well that's waiting and watching and waiting for her to die . . . . That's not recommended by anyone." Report of Proceedings (RP) at 448-49. He also rejected the suggestion that the abscess

was related to the bowel perforation, noting there is no such thing as a silent abscess for two and one-half years.

¶7 Other expert witnesses agreed with Dr. Beyersdorf. Dr. Richard Shallman, another surgeon, explained that given the catastrophic complications associated with para-esophageal hernias, they are considered semiurgent. Dr. Philip Jensen, one of Ms. Housel's treating physicians, test-ified that a paraesophageal hernia is significantly risky, explaining, "If you do nothing in a patient like that, you run the risk that that patient is going to have an abdominal catastrophe and it can happen at any time." Clerk's Papers (CP) at 254.

¶8 Only one physician believed that Ms. Housel's ab-scess may have been related to the 2001 hernia repair. Although this physician admitted that it was unlikely an abscess could occur more than two years after the surgery, he admitted he could not identify another source. The expert testimony was otherwise unanimous that the two events were unrelated. Dr. William Eeny, an infectious disease specialist, believed the most likely cause of the abscess was Ms. Housel's diagnosed diverticulitis, noting that the type of bacteria found in the abscess were consis-tent with the type that cause diverticulitis. A vascular surgeon who treated Ms. Housel's abscess also opined that there was no relationship between the 2001 perforation and the development of the abscess over two years later.

¶9 As to her informed consent claim, Ms. Housel be-lieved that she had to submit to surgery because Dr. James told her that her condition was semiurgent. She denied that he informed her of any alternatives, including nontreat-ment. She also testified that Dr. James failed to inform her of any potential complications but conceded that he had discussed the possibility of an open surgery. Dr. James testified that he extensively discussed his recommendation with her, including the risks of her prior surgeries, the risks of injury, and potential complications.

¶10 A jury returned a verdict in favor of Dr. James on both the medical negligence and breach of informed consent claims.

## ANALYSIS

### Informed Consent

¶11 Ms. Housel first assigns error to the trial court's exclusion of evidence about Dr. James's alleged operative inexperience to support her informed consent claim. At trial, she pointed to medical literature linking a surgeon's inexperience with increased complications, arguing that Dr. James's lack of operative experience should have been disclosed as a material fact necessary to informed consent. During the colloquy, the court reviewed Dr. West's deposition and inquired of counsel about the foundation for allowing the testimony. Counsel for Dr. James pointed out that although Dr. West believed that Dr. James's inexperience *may* have motivated him to perform the surgery, such inexperience was not related to the perforation. Therefore, there was no foundation to make evidence of inexperience relevant to Ms. Housel's informed consent claim. The trial court agreed, excluding evidence of Dr. James's inexperience as it related to the informed consent issue, noting that generally a physician's experience in performing a procedure is not material to an informed consent claim.

¶12 We review orders excluding evidence for an abuse of discretion. *Thomas v. Wilfac, Inc.*, 65 Wn. App. 255, 262, 828 P.2d 597 (1992). An abuse of discretion occurs if no reasonable person would adopt the position of the trial court. *Id.*

¶13 A patient may recover for a doctor's failure to provide informed consent even if the medical diagnosis or treatment was not negligent. *Backlund v. Univ. of Wash.*, 137 Wn.2d 651, 663, 975 P.2d 950 (1999). The basis for such a claim is that patients have the right to make decisions about their medical treatment. *Id.*; *see also Smith v. Shannon*, 100 Wn.2d 26, 29, 666 P.2d 351 (1983).

¶14 To prevail on a claim for failure to secure informed consent, Ms. Housel had to establish that (1) Dr. James failed to inform her of a material fact relating to treatment, (2) she consented to the treatment without being aware of or fully informed of such fact, (3) a reasonably prudent patient under similar circumstances would not have consented to the treatment if informed of such fact, and (4) the treatment in question proximately caused the injury. RCW 7.70.050(1).

¶15 In *Whiteside v. Lukson*, 89 Wn. App. 109, 947 P.2d 1263 (1997), this court ruled that generally a surgeon's inexperience is not material to informed consent. In *Thomas*, we ruled that the informed consent statute "requires disclosure of material facts relating to treatment, not disclosure of a physician's qualifications." *Thomas*, 65 Wn. App. at 261. In that case, the plaintiff argued that RCW 7.70.050(1) requires a physician to inform a patient of his qualifications. We concluded that a physician must disclose only those risks of a "material nature," and that "[t]he question of materiality is for the trier of fact." *Id.* at 260. However, we are mindful that in *Thomas* the issue of inexperience was immaterial to the plaintiff's claim because it was based on the doctor's misdiagnosis of her condition, not a failure to advise her of material facts relating to treatment of that condition. *Id.* at 261.

¶16 In the present case, Ms. Housel failed to make an adequate showing that Dr. James's alleged inexperience was a material treatment-related fact. None of the medical experts, including Ms. Housel's own expert, testified that this was the case. Accordingly, the court was well within its discretion to exclude the evidence. However, in so ruling, we are not categorically holding that a physician's inexperience is never material to an informed consent claim. There may well be situations where evidence of a physician's experience, or lack thereof, would be a significant factor in a patient's decision to undertake a particular course of treatment. But such a situation is not present here.

¶17  We next address Ms. Housel's contention that Dr. James should have informed her that watchful waiting was a viable alternative to surgery. Washington's informed consent law provides that a physician must inform the patient of recognized possible alternative forms of treatment, including nontreatment. RCW 7.70.050(3). It is for the patient to evaluate the risks and decide upon the treatment; the physician's role is to provide the basis for an informed consent decision. *Brown v. Dahl*, 41 Wn. App. 565, 570, 705 P.2d 781 (1985); *Archer v. Galbraith*, 18 Wn. App. 369, 567 P.2d 1155 (1977).

¶18  Whether Dr. James informed Ms. Housel of alternatives to surgery, including nontreatment, is a question of fact the jury resolved in Dr. James's favor. Credibility determinations are for the finder of fact. *State v. Camarillo*, 115 Wn.2d 60, 71, 794 P.2d 850 (1990). Ms. Housel's credibility was likely undermined by her claim that none of her previous physicians had advised her of the risks or alternatives regarding her medical procedures. This claim was countered by both Dr. Jensen and Dr. James. The jury was entitled to reject her testimony.

¶19  Moreover, the jury was correctly instructed that Ms. Housel's signature on the consent form is prima facie evidence of informed consent. RCW 7.70.060. The consent form disclosed the potential risks and complications of the surgery, as well as the alternative of nontreatment. It stated in relevant part:

> I certify that my physician has informed me of the nature and character of the proposed treatment . . . of the possible alternative forms of treatment; and the recognized serious possible risks, complications, and the anticipated benefits involved in the proposed treatment and in the alternative forms of treatment, including non-treatment.

CP at 167.

¶20  Dr. James testified that he personally reviewed the form with Ms. Housel and was present when she signed it. The jury was entitled to reject Ms. Housel's claim.

¶21 Finally, Ms. Housel's contention that Dr. James should have informed her that the surgery should have been performed in a high volume center is without merit. There is no evidence in the record to support this claim.

*Instructional Error*

¶22 Ms. Housel next assigns error to jury instruction 6A, which stated that "the standard of care of a medical practitioner may only be established by testimony of medical experts." CP at 313. She argues that if only experts may establish the standard of care, "then a verdict for a victim of medical negligence will likely be returned only if the weight of medical testimony favors the plaintiff. This is not the law." Br. of Appellants at 27.

¶23 Jury instructions are adequate if they are supported by substantial evidence, allow each party to argue its theories of the case, and, when read as a whole, properly inform the jury of the applicable law. *State v. Clausing*, 147 Wn.2d 620, 626, 56 P.3d 550 (2002). "We review de novo claimed errors of law in the giving of jury instructions." *Hall v. Sacred Heart Med. Ctr.*, 100 Wn. App. 53, 61, 995 P.2d 621 (2000). The precise wording of the instructions is within the broad discretion of the court. *State v. Alexander*, 7 Wn. App. 329, 336, 499 P.2d 263 (1972).

¶24 To prove medical malpractice under RCW 7.70-.030(1), Ms. Housel had to establish that her "injury resulted from the failure of a health care provider to follow the accepted standard of care." Violation of the standard of care is established by showing that the health care provider "failed to exercise that degree of care, skill, and learning expected of a reasonably prudent health care provider at that time in the profession or class to which he belongs, in the state of Washington, acting in the same or similar circumstances." RCW 7.70.040(1). Absent exceptional circumstances, a patient must produce expert testimony to establish whether the practice questioned is reasonably prudent. *McLaughlin v. Cooke*, 112 Wn.2d 829, 836, 774 P.2d 1171 (1989); *Harris v. Robert C. Groth, M.D., Inc.*, 99

Wn.2d 438, 451, 663 P.2d 113 (1983). Expert testimony is also required to establish causation. *Harris*, 99 Wn.2d at 451.

¶25 Ms. Housel's proposed instruction provided, "The degree of care actually practiced by members of the medical profession is evidence of what is reasonably prudent. However, this evidence alone is not conclusive on the issue and should be considered by you along with any other evidence bearing on the question." CP at 31.

¶26 The court did not err in giving instruction 6A. The Washington Supreme Court has held that nonexperts are not qualified to testify as to the proper standard of care. *Young v. Key Pharms., Inc.*, 112 Wn.2d 216, 228, 770 P.2d 182 (1989). The only recognized exception to this rule is where the lack of skill is so apparent that expert evidence is not needed. *Id.* at 228-29; *see also McLaughlin*, 112 Wn.2d at 838.

¶27 While nonexperts may testify as to symptoms and injury, only experts are allowed to testify regarding the standard of care and whether the physician met that standard. *Young*, 112 Wn.2d at 228. The *Young* court noted: "[W]e have found no cases in which a nonphysician is found competent to testify on a physician's technical medical standard of care in a medical malpractice case." *Id.* The policy behind this rule is to "prevent laymen from speculating as to what is the standard of reasonable care in a highly technical profession." *Douglas v. Bussabarger*, 73 Wn.2d 476, 479, 438 P.2d 829 (1968).

¶28 Concern about such speculation was at the heart of the trial court's ruling. Fearing that the jury might "go off on a tangent," the court concluded the jury cannot "make their own" standard of care. RP at 566. The instructions in a particular case are governed by the facts of the case. *Allison v. Dep't of Labor & Indus.*, 66 Wn.2d 263, 267, 401 P.2d 982 (1965). The facts of this case support the giving of instruction 6A. The only testimony pertaining to the appropriate standard of care was provided by physicians, including Ms. Housel's medical expert. Nothing in the instruction

precluded the jury from considering all of Ms. Housel's evidence regarding the proper standard of care. The standard of care and skill required in a paraesophageal hernia repair is highly technical; the procedures involved are not facts observable by laypersons. Because instruction 6A was a correct statement of the law, was not misleading, and did not prevent Ms. Housel from arguing her theory of the case, we conclude the trial court did not err in giving it.

¶29 Finally, Ms. Housel contends the court erred in giving the error-of-judgment instruction, contending there is no factual basis in the record to support it. The instruction at issue provided:

> A physician is not liable for selecting one of two or more alternative courses of treatment, if, in arriving at the judgment to follow the particular course of treatment, the physician exercised reasonable care and skill within the standard of care the physician was obliged to follow.

CP at 315.

¶30 This instruction is to be used cautiously and only when there is evidence that the defendant physician was confronted with a choice among competing diagnoses or techniques, and in arriving at the judgment, the physician exercised reasonable care and skill within the standard of care he was obliged to follow. *Gerard v. Sacred Heart Med. Ctr.*, 86 Wn. App. 387, 389, 937 P.2d 1104 (1997); *see also Watson v. Hockett*, 107 Wn.2d 158, 165, 727 P.2d 669 (1986) (holding that the instruction is to be given "with caution" and should be limited to situations where the doctor is faced with a choice of treatments).

¶31 Notwithstanding Ms. Housel's assertion to the contrary, the record discloses that Dr. James was presented with at least three treatment choices: additional testing, watchful waiting, or surgical repair of the hernia. There is sufficient evidence that in electing to proceed with surgical repair of the hernia, he exercised reasonable care and skill within the standard he was obliged to follow. We therefore conclude there was no instructional error.

## CONCLUSION

¶32 Having considered all of the contentions raised by Ms. Housel and finding no error, we affirm.

STEPHENS, J., concurs.

SWEENEY, C.J., concurs in result only.